| |
|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** |
| **Caption in Compliance with D.N.J. LBR 9004-2(c)** |
| Morris S. Bauer<br>Melissa A. Peña<br>NORRIS McLAUGHLIN & MARCUS, PA<br>721 Route 202-206<br>P.O. Box 5933<br>Bridgewater, New Jersey 08807-5933<br>(908) 722-0700<br>Attorneys for Debtor, Prisco Properties, LLC |

| In Re: | Chapter 11 |
|---|---|
| PRISCO PROPERTIES, LLC, | Case No.: 10-21719 (KCF) |
| Debtor. | Judge: Kathryn C. Ferguson |

**MEMORANDUM OF LAW IN OPPOSITION TO TD BANKNORTH, N.A.'S MOTION TO CONVERT THE DEBTOR'S CHAPTER 11 CASE TO CHAPTER 7**

*Of Counsel and On the Brief:*

        Morris S. Bauer
        Melissa A. Peña
        Norris McLaughlin & Marcus, P.A. Attorneys
        for Debtor, Prisco Properties, LLC
        721 Route 202-206
        P.O. Box 5933
        Bridgewater, New Jersey 08807-5933
        (908) 722-0700

The debtor, Prisco Properties, LLC (the "Debtor") respectfully submits this memorandum of law in opposition to the motion by TD Banknorth, N.A. ("TD") seeking to convert the Debtor's Chapter 11 bankruptcy case to a case under Chapter 7 of the Bankruptcy Code (hereinafter the "Conversion Motion").

## PRELIMINARY STATEMENT

The instant Conversion Motion is TD's latest attempt to derail the Debtor's efforts to confirm its proposed Chapter 11 plan of reorganization (the "Plan"). On July 18, 2010, the Debtor filed the Plan and its Disclosure Statement. Under the Plan, the Debtor proposes (i) to pay TD in full on its allowed secured claim of approximately $5,560,000 over 5 years with interest at a rate as determined by the Court, which the Debtor believes should be the prime rate plus 2%, and monthly interest payments based on the prime rate plus 2% under a 25 year amortization schedule commencing on the effective date in the approximate amount of $24,325; (ii) payment of administrative claims in full; and (iii) a $350,000 distribution to general unsecured creditors. The Plan is being funded by Dina Johannemann, who holds a 2% interest in the Debtor, and is the wife of the Debtor's managing member, Anthony Prisco. In exchange for funding the Plan, Ms. Johannemann will acquire all of the equity interest in the reorganized Debtor.

Without question, the Plan proposed by the Debtor is reasonably confirmable. With the exception of TD, it is anticipated that all of the Debtor's creditors will support the Plan. Furthermore, the Debtor has sufficient monies to fund the Plan by way of the rents stemming from its real property, located at 2211 and 2219 Allenwood Road, Wall New Jersey (the

"Property") and fees arising from its logistics business, which currently aggregate approximately $46,000 per month.[1]

While TD contends that the Plan is patently unconfirmable because it does not provide for it to credit bid or for competitive bidding, TD has not presented any other proposal to the Debtor which will provide a greater distribution to the Debtor's creditors. Ms. Johannemann has offered the following to the Debtor: (a) an upfront payment of $100,000; (b) an agreement to pay general unsecured creditors and administrative creditors from the Debtor's future revenues; and (c) an agreement to pay TD $5,560,000 from the Debtor's future revenues and to refinance or sell the subject property in 5 years. Under these circumstances and as further demonstrated below, the Debtor should have an opportunity to confirm its Plan warranting the denial of the Conversion Motion.

Moreover, there is no greater evidence of the Debtor's ability to confirm the Plan than this Conversion Motion - a motion brought by TD in order to avoid the Plan being confirmed over its objection. By way of the Conversion Motion, TD has miserably failed to establish "cause" warranting the conversion of the Debtor's bankruptcy case pursuant to Section 1112(b) of the Bankruptcy Code. Instead, TD has cobbled together one red herring after another contending that conversion is appropriate because (i) Mr. Prisco is self-interested and not carrying out the fiduciary duties incumbent upon a debtor-in-possession; (ii) Mr. Prisco is grossly mismanaging the Debtor's business; and (iii) the Debtor has engaged in the unauthorized use of cash collateral.

---

[1] The total amount of the Debtor's monthly revenues (without Walmart) is $37,000 and with Walmart is $46,000 on an annualized basis.

In support of the alleged basis for conversion, TD presents to the Court half-truths and wholly misconstrues the facts. With respect to its *frivolous* claim that Mr. Prisco is purportedly unfit to carry out the fiduciary duty incumbent on a debtor-in-possession, TD argues that Mr. Prisco has not caused the Debtor to assert claims against Matrix and CIT as it does not suit his own self-interest. Ironically, it is TD who is acting in its own self-interest as it seeks to take title to the Property without providing any monies to the other creditors.

Moreover, as the managing member of the Debtor, Mr. Prisco has evaluated the Debtor's potential claims against Matrix and CIT. This investigation has revealed that pursuit of such claims would be costly to the Debtor's estate. At this stage, the Debtor is focused on confirming its Plan, which represents the only opportunity for all of its creditors to obtain a recovery.

Equally without merit is TD's contention that the Debtor has engaged in the unauthorized use of cash collateral. Since the Petition Date, all post-Petition rents have been paid by the Debtor's sole pre-Petition tenant, Beverage Works, to TD. The only monies utilized by the Debtor post-Petition arise from revenues from its logistics business. The Debtor has consistently taken the position that the service/storage fees fall outside the purview of TD's Assignment of Rents and commenced an adversary proceeding to litigate this very issue. Without the Court ruling on this issue and after taking no action to stop the Debtor's *alleged* unauthorized use of cash collateral for in excess of 4 months, TD now claims that the Debtor's use of the service/storage fees constitutes the unauthorized use of its cash collateral. This absurdity does not constitute grounds for conversion especially given every penny of the service/storage fees has been utilized to pay for expenses on the Property.

Accordingly and as further demonstrated below, TD has not established "cause" to convert the Debtor's Chapter 11 case and the Debtor should be afforded an opportunity to proceed with confirming the Plan.

## STATEMENT OF FACTS

As its Statement of Facts, the Debtor shall rely upon the Certification of Anthony Prisco in Opposition to the Conversion Motion.

## LEGAL ARGUMENT

### POINT I

### THE CONVERSION MOTION SHOULD BE DENIED AS THE DEBTOR HAS PROPOSED A PLAN OF REORGANIZATION THAT IS REASONABLY CONFIRMABLE.

Section 1112(b) of the Bankruptcy Code provides as follows:

(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104 (a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, *if* the movant establishes cause.

11 U.S.C. § 1112(b) (emphasis added).

In considering whether conversion is in the best interest of the creditors, courts focus on whether the debtor can confirm its Chapter 11 plan. See In re Union County Wholesale Tobacco & Candy Co., 8 B.R. 439, 441 (Bankr. D.N.J. 1981) (recognizing that when considering a motion to conversion, the court must analyze whether a debtor's plan is capable of confirmation). If continuing a Chapter 11 case would promote the goals of preserving a going concern and maximizing property available to satisfy creditors, than conversion is inappropriate. In re 4 C Solutions, Inc., 289 B.R. 354, 364 (Bankr. C.D. Ill. 2003).

4

In the instant Conversion Motion, TD attempts to establish "cause" to convert this case based solely on the Debtor's *purported* gross mismanagement of the estate and unauthorized use of cash collateral pursuant to Section 1112(b)(4)(B) and (D).  Although TD makes reference to side arguments questioning the viability of the Debtor's Plan, it is telling that TD has not and cannot move pursuant to Section 1112(b)(4)(A), which provides that "cause" exist to covert a case when there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." See 11 U.S.C. § 1112(B)(4)(A).  As demonstrated below, the Debtor has a reasonable likelihood of confirming its Chapter 11 plan, pursuant to Section 1129(b) of the Bankruptcy Code, as (i) the Debtor is likely to obtain the support of an impaired consenting class; (ii) the Plan is feasible; and (iii) the Plan is proposed in good faith.

A.    **The Plan is Reasonably Confirmable as the Debtor is Likely to Obtain the Support of its Creditors with the Exception of TD.**

It is anticipated that the Debtor will obtain the support of virtually all of its creditors and, as a result, the Plan is reasonably confirmable.  The Debtor is confident that Class 4 of the Plan, which consists of all Allowed General Unsecured Claims, will support the Plan.  Class 4 includes the following:  (i) the deficiency claim of TD in the amount of approximately $1,940,000; (ii) the general unsecured claim of CIT in the amount of approximately $4,900,000; and (iii) the claims of ten general unsecured creditors totaling approximately $150,000.  As the proposed Plan represents the only manner in which CIT and the general unsecured creditors will recover on their claims, these creditors will, in all likelihood, vote in favor of the Plan. As their claims will be more than one-half in number and at least two-thirds in amount of the allowed claims for such class, the Debtor will obtain the support of an impaired consenting class to confirm the Plan.

Furthermore, not only is it anticipated that the Debtor will have the support of an impaired consenting class, but the Plan is capable of being confirmed over TD's objection as it

5

provides for the fair, equitable and commercially reasonable treatment of TD's claim - payments to TD of interest at an above market rate with a balloon payment after 5 years.

**B.    The Plan is Feasible.**

The Plan is also feasible. As set forth above, the terms of the Plan provide for (i) TD to be paid in full on its allowed secured claim of approximately $5,560,000 over 5 years with interest at a fixed market rate to be determined by the Court and monthly interest payments commencing on the effective date in the approximate amount of $24,325; (ii) payment of administrative claims in full; and (iii) a $350,000 distribution to general unsecured creditors. As the Plan is being funded by Dina Johannemann, it further provides for her acquisition of the equity interest in the Debtor. The Debtor intends to fund the Plan from all post-Petition rents generated from the property and the revenues generated from the Debtor's logistics business.

As detailed below, the Plan is feasible as (1) there is a reasonable likelihood that the Debtor will meet its cash flow projections; (2) the post-Petition rents arising from the Property can be utilized to fund the Debtor's obligation to TD under the Plan; and (3) the revenues generated from the Debtor's logistics business are available to fund the Plan.

**1.    There is a Reasonable Prospect that the Debtor will Meet its Cash Flow Projections.**

The Plan is feasible as there is a reasonable prospect that the Debtor will meet its cash flow projections. TD attempts to attack the Debtor's 2009 revenues by improperly manipulating the real total revenues to a lesser amount. Contrary to TD's interpretation, the Debtor's total revenues for 2009 aggregated $610,925.01, which includes an approximately $211,000 rent credit to Beverage Works for expensing monies on behalf of the Debtor to retrofit its space. For the year 2010 to date, the Debtor's revenues approximate $365,000 and the Debtor anticipates total revenues for 2010 of over $500,000 on a conservative basis. The Plan projects the annual

revenues in year 1 to be $790,000 and expenses in year 1 to aggregate $590,000. See Certification of Anthony Prisco in Opposition to the Conversion ["Prisco Cert."], submitted herewith, at ¶ 21.

The total amount of the Debtor's monthly revenues (without Walmart) is $37,000 and with Walmart is $46,000 on an annualized basis. Under the Plan, the anticipated monthly obligation payable to TD is $24,325 per month, and to the other unsecured creditors $5,833.33 per month. Real estate taxes approximate $6,376.66 per month. Clearly, the Debtor is generating sufficient monies to satisfy the monthly obligations contemplated by the Plan. Id. at ¶ 11.

## 2. The Post-Petition Rents Are Available for the Debtor to Fund its Chapter 11 Plan.

The Plan is feasible as the post-Petition rents arising from the Property can be utilized by the Debtor to fund the Plan. First and foremost, the Debtor maintains that the post-Petition rents arising from the Property constitute property of the Debtor's estate pursuant to Sections 541(a)(1) and 541(a)(6) of the Bankruptcy Code notwithstanding the Assignment of Rents between TD and the Debtor (the "Assignment"). In support of this argument, the Debtor shall rely upon its memorandum of law in opposition to TD's motion to dismiss counts I and II of the Debtor's Adversary Complaint against TD whereby the Debtor argues that the Third Circuit decision in In re Jason Realty, L.P., 59 F.3d 423 (3d Cir. 1995) was wrongly decided and/or does not apply to rents arising from post-Petition leases entered into by the debtor-in-possession.

Moreover, even if this Court finds that under Jason Realty, the post-Petition rents do not constitute property of the Debtor's estate, the rents are still available to fund the Debtor's obligation to TD under the Plan pursuant to the subject loan documents. The Assignment provides, in pertinent part, as follows:

7

The net proceeds (after deduction of expenses including all expenses and payments permitted under Sections 10 and 12 of the Mortgage) collected by Assignee under the terms of this Assignment shall be applied to reduce the indebtedness from time to time outstanding under any Obligations.

See Exhibit P-R of the Certification of John August, Docket No. 45, the Absolute Assignment of Rents at ¶ 12. Obligations is defined under the Assignment as "all existing and future indebtedness, obligations, liabilities and duties of all kinds owing from the [Debtor] to [TD], whether direct or indirect, contingent or non-contingent, liquidated or unliquidated, matured or unmatured or due or to become due arising under or defined in the Note and the Mortgage." Id. at p. 2.

Under its Plan, the Debtor seeks to recast its obligation to TD to an allowed secured claim equal to the value of the Property pursuant to Sections 506(b) and (d) of the Bankruptcy Code, which the Debtor believes is approximately $5,560,000 (hereinafter the "Recast Obligation"). In the event the Court finds that the post-Petition rents are not property of the estate, the rents shall be exclusively paid to TD and, pursuant to the Assignment, TD must apply the rents to the Debtor's obligation to pay principal and interest on the Recast Obligation.[2] Thus, the Plan is feasible as the post-Petition rents are available for the Debtor to fund the Recast Obligation to TD regardless of this Court's ruling on the Jason Realty issue.

---

[2] If TD was permitted to collect the rents to satisfy its pre-Petition claim of $7,500,000, this would allow the bank to elevate its general unsecured claim to a secured claim in contravention of the priority structure set forth in the Bankruptcy Code and to the detriment of the general unsecured creditors. Furthermore, Section 1141 of the Bankruptcy Code provides that (i) all creditors are bound by the confirmed plan whether they have accepted the plan or not; (ii) that upon confirmation of the plan, property must vest in the reorganized debtor; and (iii) that post-confirmation, the property dealt with by the plan is free and clear of all claims and interests except as otherwise provided in the subject plan. See 11 U.S.C. § 1141(a) – (c). If TD Bank was entitled to continue to collect the rents in satisfaction of its pre-Petition claim, the Debtor's confirmed Plan and Section 1141 would be rendered meaningless.

**3.     The Service/Storage Fees Are Available to Fund the Debtor's Plan as they Constitute Property of the Debtor's Estate.**

The Plan is feasible as the Debtor has an additional funding source – the service/storage fees generated from the Debtor's logistics business.  In the Adversary Proceeding against TD, the Debtor seeks a declaratory ruling that the service/storage fees constitute property of the Debtor's estate and do not fall within the purview of the Assignment.  The Debtor can establish that the service/storage fees are the Debtor's post-Petition accounts receivable and do not constitute rent or income arising from the Property.

In order to determine whether monies received by a debtor constitute rents or income generated from real property, courts analyze the nature of the relationship between the payee and the debtor.  See United States of America v. Real Property Located at Incline Village, et al., 967 F.Supp. 1327 (D. Nevada 1997).  Courts have consistently found that when payments are received from a payee who uses the property, the monies are not rents or income generated from the real property when the payee is not assigned a specific space on the property and/or given exclusive possession to occupy a portion of the property.  See In Re GGVXX, 130 B.R. 322 (Bankr. D. Colo. 322) (finding revenues derived from green fees to use a debtor's golf course were not subject to bank's security interest for rents and income stemming from the property where golfer did not obtain an interest in real property).  In re Northport Marina Associates, 136 B.R. 911 (Bankr. E.D.N.Y. 1992); In Re Kearney Hotel Partners, 92 B.R. 95 (Bankr. S.D.N.Y. 1988).

In Kearney, *supra* at 96, the Court addressed whether hotel revenues obtained from a debtor constituted the debtor's post-Petition accounts receivables or rents/income generated from the real property such that they would be subject to an Assignment of Rents provided by the debtor to its secured lender.  Under the subject Deed of Trust and Assignment of Leases and

9

Cash Collateral, the debtor assigned all of its cash collateral derived from the property to the lender. Cash collateral was defined to include "all rents, income, receipts, revenues, issues, profits, and other income of any nature now due or which may become due or to which Mortgagor may now or hereafter . . . become entitled to . . ." Id.

In determining whether the hotel revenues constituted rents or income generated from the property, the Court considered the length of the period of time the room was used, the character of the premises, the nature of the business operated thereon and the extent of the control of supervision maintained by the proprietor or possessor of the premises. The Court described the differences between a hotel guest and a tenant as follows:

> A tenant is deemed to have exclusive legal possession of the demised premises and stands responsible for their care and condition. A guest, on the other hand, has merely the right to use of the premises while the innkeeper retains his control over them, is responsible for the necessary care and attention and retains the right of access for such purposes.

Id. at 99 quoting Buck v. Del City Apartments, Inc., 431 P.2d 360, 363 (Okl. 1967). Reasoning that the hotel guest did not acquire an interest in the realty, the Kearney Court found that the hotel revenues were not an interest in realty analogous to rent and, thus, the hotel revenues did not fall within the purview of the secured lender's assignment. Id.

Similarly, in Northport Marina, the Court found that revenues generated from a marina storage business did not constitute rent or income generated from the property and, as a result, were not subject to the mortgagee's prepetition security interest in rents arising from the property. The debtor stored boats for customers pursuant to a Winter Storage and Service Agreement, which provided for the storage of boats on the debtor's property for no established length of time and granted the debtor the right to move the boat to any area on its property in its sole discretion. The subject assignment of leases and rents granted the bank a security interest

on "all earnings, revenues, rents, issues, profits and income of the Mortgaged Property . . ." Id.
at 913. Notwithstanding the broad language of the Assignment, the Court found that the storage
fees stemmed from a service rendered by the debtor and not the property. The Court reasoned as
follows: ". . . what is provided [by the debtor] is storage rather than the right to occupy a
particular space. Sale of a service like storage results in an account receivable and such revenues
are, therefore, outside the [bank's] security interest." Id. at 916.

Similar to the hotel revenues in Kearney and the storage fees in Northport Marina, the
Debtor can establish that the revenues generated from the Debtor's logistic business are not
subject to the Assignment. It cannot be overemphasized that these revenues are generated from
services being rendered by the Debtor. The Debtor receives and stores goods for its customers
and, in some cases, provides pick-pack and ship services and performs other administrative
services. Moreover, under the Debtor's warehouse service agreements, the Debtor's customers
are not given an interest in the Property nor are they given exclusive access to a space on the
Property. In fact, the Debtor has the right, in its sole discretion, to move the customer's property
within the building. Thus, it is evident that what the Debtor's customers are paying for is the
storage services being rendered by the Debtor and, thus, these revenues do not fall within the
purview of the Assignment. See Prisco Cert. at ¶ 10.

Furthermore, the State of New Jersey acknowledges that storage is a service, which is
rendered by a business and not some form of lease or license. In 2006, the State of New Jersey
amended the New Jersey Sales and Use Tax Act to impose a tax on the furnishing of space for
storage of personal property. The July 7, 2006 Bill enacted by the State of New Jersey
specifically states that "[t]he bill extends the sales tax to charges for the following *services*:
furnishing of space for storage . . ." Assembly Bill No. 4901 at p.1-2 (emphasis added).

11

Accordingly, it is without question that the service/storage fees do not constitute rents or income from the Property subject to the Assignment and these revenues are available for the Debtor to fund the Plan. [3]

### C.   The Plan is Proposed in Good Faith and is Not Patently Unconfirmable.

TD erroneously contends that the Plan is patently unconfirmable as it (i) purportedly violates an August 31, 2010 Order in favor of TD charging Mr. Prisco's membership interests in the Debtor (hereinafter the "Charging Order"); and (ii) the Plan is a new value plan which gives favorable treatment to an insider, Ms. Johannemann.  As detailed below, both of these arguments fail.

### 1.   The Plan Does Not Violate the Charging Order.

TD cannot credibly argue that the Plan violates the Charging Order.  Under the Plan, the Debtor cancels all equity interest whether held by Mr. Prisco or Ms. Johannemann.  While the Charging Order enjoins Mr. Prisco from selling, assigning or otherwise impairing his membership interest in the Debtor, *it is not binding on the Debtor.*  The Debtor was not a party to TD's Motion seeking the entry of an Order charging Mr. Prisco's membership interest and, thus, the Charging Order was not entered against it.  Certainly, TD must agree that the post-Petition Charging Order is not binding on the Debtor given TD never sought stay relief to proceed against the Debtor.  Given these circumstances, the Plan can hardly be characterized as patently unconfirmable on the grounds that it violates the Charging Order.

---

[3] The Debtor's next payment for sales tax on the service/storage fees is due at the end of September 2010.  The Debtor is aware of its obligation to pay same.  Moreover, the Debtor intends to modify the cash flow projections annexed to its Disclosure Statement to account for sales tax.

### 2.    The Debtor's Plan is Proposed in Good Faith as Mr. Prisco's Wife is Providing Valuable Consideration to Acquire a Membership Interest in the Debtor.

Equally without merit is TD's argument that the Plan is a new value plan which gives favorable treatment to an insider, Ms. Johannemann.[4]  It is without question that Ms. Johannemann is offering significant consideration to acquire the equity interest in the Debtor. Specifically, Ms. Johannemann has offered the following:

- a $100,000 payment on the effective date of the plan;

- an agreement to pay in excess of $350,000 plus out of the Debtor's revenues to fund payments to the Debtor's general unsecured creditors and administrative creditors; and

- an agreement to pay $5,560,000 to TD with interest from future revenues and to refinance or sell the property in 5 years.

Taken together, the full price being offered by Ms. Johannemann is approximately $6,000,000.

While TD complains that the Plan precludes it from credit bidding and is not open to competitive bidding, the truth of the matter is that TD is not concerned with maximizing the value of the Debtor's estate and only wants to take the property back leaving the Debtor's other creditors with nothing.   TD has no right to credit bid pursuant to the Third Circuit decision in In re Philadelphia Newspapers, 599 F.3d 298 (3d Cir. 2010) (finding that secured creditors are not entitled to credit bid their debt in a sale proposed under a plan of reorganization).  Even if TD

---

[4] In its Objection to the Debtor's Disclosure Statement, TD makes much of the fact that the Debtor did not identify Ms. Johannemann as Mr. Prisco's wife.  The Debtor acknowledges this error and intends to modify this error in its Disclosure Statement.  Although TD claims that this was a malicious attempt to hide Ms. Johannemann's identity, TD cannot deny that the Debtor's two largest creditors, TD and CIT (who engaged in pre-Petition litigation with the Debtor and were present for two days of Mr. Prisco's deposition) are wholly aware that Ms. Johannemann is Mr. Prisco's wife.

was permitted the right to credit bid, any credit bid by the bank would not provide for a carve-out in excess of $450,000 to pay administrative claims and unsecured claims.

Furthermore, TD is well aware that there are no higher offers that will provide more value to *all* of the Debtor's creditors. TD has not received any offers to purchase the Debtor's property in an amount in excess of the distributable amounts set forth in the Plan. In fact, the highest offers received by TD were a $5,000,000 offer to purchase the property, which the Debtor brought to TD prior to the Petition Date, and the Debtor's recent settlement offer to pay the bank $4.5 million in *three* months - both of which were outright rejected to by TD. See Prisco Cert. at ¶¶ 54 and 69.

The bottom line is that TD is fully aware that the Debtor will gladly entertain any proposal that provides for more value for *all* of its creditors. To date, no such offer has been received by TD or any other party.

## POINT II

## TD HAS FAILED TO ESTABLISH "CAUSE" TO CONVERT THE DEBTOR'S CHAPTER 11 CASE TO CHAPTER 7.

Aside from the overwhelming proof that the Debtor has a reasonably confirmable Plan, this Court must deny the Conversion Motion as TD has utterly failed to demonstrate "cause" to convert the Debtor's Chapter 11 case to Chapter 7.

Under Section 1112(b) of the Bankruptcy Code, a court may convert a Chapter 11 case only for "cause." See In re Muralo, 301 B.R. 690, 696 (Bankr. D. N.J. 2003). Although it is within the court's discretion to convert a Chapter 11 case, this discretion should be exercised cautiously and with great care as the conversion of a Chapter 11 case is a drastic measure. In re Daily Corp., 72 B.R. 489, 494 (Bankr. E.D. Pa. 1987). A party moving for conversion under Section 1112(b) bears the burden of proving by a preponderance of the evidence that cause exists

14

to convert a debtor's case. In re Shar, 253 B.R. 621 (Bankr. N.J. 1999); In re Lizeric Realty Corp., 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995). "The harshness of conversion or dismissal mandates that it results only upon a strong evidentiary showing." In re Dark Horse Tavern, 189 B.R. 576, 580 (Bankr. N.D.N.Y. 1995).

As detailed below, TD's multiple misrepresentations do not satisfy its burden to establish cause of conversion.

### A.      There is No Self-Dealing by the Debtor's Principal to Justify Conversion.

TD speciously argues that the Debtor's failure to prosecute claims against CIT and Matrix as well as Mr. Prisco's *purported* self-dealing constitutes grounds for conversion. As demonstrated below, the Debtor's decision not to pursue claims against CIT and Matrix is reasonable and there is no evidence of self-dealing by Mr. Prisco.

### 1.      The Debtor Has Properly Investigated it Potential Claims Against CIT.

TD contends that CIT's claim against the Debtor's estate is avoidable by the Debtor as a fraudulent conveyance on the grounds that the Debtor received no adequate consideration in exchange for its obligation to CIT as all consideration flowed to GI Apparel, Inc. ("GI Apparel").

As detailed in Mr. Prisco's Certification in Opposition, submitted herewith, GI Apparel was a company owned by Mr. Prisco, which was engaged in the business of selling screen printed t-shirts. From 2003 to 2007, GI Apparel was the Debtor's primary tenant and the rents paid by GI Apparel enabled the Debtor to service its debt to TD (and TD's predecessor in interest). TD was initially GI Apparel's lender. In February of 2007, GI Apparel entered into a new lending relationship with CIT moving all of GI Apparel's loans to CIT and leaving the loans of the Debtor with TD. The Debtor guaranteed CIT's loans at that time, subordinated to TD for $150,000. At closing, TD had in its possession $150,000 of GI Apparel's collateral which had

been provided by Mr. Prisco, personally, and which was being used by TD as side collateral for GI Apparel's obligation to the Debtor. CIT wanted that side collateral to move with the transfer of all of GI Apparel's loans. TD was fully aware of this, did not object to this and it was TD that wired these funds to CIT at the loan closing. Contrary to TD's assertions the $156,000 in controversy ($150,000 + $6,000 of interest) was not transferred under duress and was provided in February of 2007 rather than November of 2007. See Prisco Cert. at ¶ 51.

Thereafter, in November of 2007, CIT began to view GI Apparel as a credit risk and sought to further collateralize its loan with GI Apparel. At such time, the Debtor provided CIT with a mortgage lien on its Property of $4,000,000. See Id. at ¶ 52.

TD contends that CIT's claim is avoidable by the Debtor as a fraudulent conveyance on the grounds that the Debtor received no adequate consideration in exchange for the guaranty, the mortgage and its cash pledge.[5] The Debtor has analyzed its potential claim against CIT and recognizes that it may be unable to prevail on a fraudulent conveyance claim against CIT. CIT will likely argue that the Debtor received consideration in exchange for the subject guaranty, cash pledge and mortgage. By guarantying the obligation of GI Apparel, the Debtor initially induced CIT to provide GI Apparel with a line of credit and, in November of 2007, when CIT viewed GI Apparel as a credit risk, the mortgage lien granted by the Debtor caused CIT to maintain the line of credit it provided to GI Apparel. CIT will further argue that the Debtor received a benefit as CIT's loans allowed the Debtor's primary tenant to continue to meet its obligations under its lease with the Debtor.

---

[5] Ironically, a claim could also be made by the Debtor that TD's fourth mortgage on the property in the principal amount of $2,500,000 is a fraudulent conveyance as such mortgage secured an obligation of GI Apparel to TD. Following TD's logic, arguably, the Debtor received no consideration in exchange for such mortgage.

As the claim against CIT is by no means a slam dunk, the Debtor has chosen not yet to pursue CIT as its resources are better expended on seeking to confirm the Plan. The statute of limitations on the cause of action against CIT is not set to expire until, at the earliest, April 2012. The Plan does not waive any claims that the Debtor may have against CIT.[6] Given the Debtor's potential claim against CIT can still be pursued post-Confirmation, it would be a waste of the Debtor's limited resources to prosecute this claim prior to determining whether its Plan will be confirmed.

Moreover, TD's contention that the Debtor is not seeking to recover the $156,000 cash pledge to CIT because it would result in increasing Mr. Prisco's purported liability on his personal guaranty to CIT is preposterous. Whether CIT's claim against Mr. Prisco, which is in excess of $5,000,000 is increased by $156,000 is of no moment as, under either scenario, Mr. Prisco must seriously consider commencing an individual bankruptcy case.

### 2. The Debtor Has Determined that it Has No Viable Successor-in-Interest Claims Against Matrix.

TD contends that there is "cause" to convert the Debtor's case because the Debtor, under the direction of Mr. Prisco, refuses to pursue claims against Matrix Sales Group LLC ("Matrix"), a company run by Mr. Prisco and owned by his wife. Specifically, TD alleges that the Debtor should seek to recover back rent from Matrix, which was due and owing to the Debtor from GI Apparel, as Matrix is the successor in interest to GI Apparel. Selectively relying on Mr. Prisco's deposition testimony, TD claims that Matrix is the successor of GI Apparel simply because Mr. Prisco was involved in both companies; Matrix is engaged in the same business as GI Apparel; Matrix occupies the subject property and *allegedly* utilizes GI Apparel's assets.

---

[6] In response to TD's objection to its Disclosure Statement, the Debtor intends to clarify this point in its Disclosure Statement.

Conveniently, TD fails to mention to the Court that during his deposition, Mr. Prisco also testified to the following:

- Matrix was "originally created as an entity that at some point would become a sales and marketing entity." See Deposition Transcript of Anthony Prisco [Prisco Dep.] as Exhibit A to Certification of John August, Docket No. 45 at 31:5-6.

- Mr. Prisco and his wife intended for Matrix to be a separate business from GI Apparel and not a complimentary business. Id. at 31:21-32:1.

- Matrix was formed a year prior to GI Apparel's failure and Mr. Prisco originally intended for Matrix to be engaged in the licensing business. Id. at 31:8-9, 32:5-6.

- Of Matrix's approximately 50 customers, only 10 are customers that were previously serviced by GI Apparel and these customers are also well-known in the industry. Id. at 41:2-8, 135:9-18.

- While Mr. Prisco is the CEO of Matrix, he has never received any compensation from the company because Matrix has not made any money. Id. at 41:9-13.

- At an auction held by CIT to liquidate GI Apparel's assets, Matrix purchased the right to utilizing the preexisting artwork of GI Apparel for $100,000 and no further assets of GI Apparel. Id. at 200:9-19.

- Mr. Prisco's wife, the sole owner of Matrix, paid CIT the $100,000 to utilize GI Apparel's preexisting artwork and has paid all operational expenses of Matrix from her own separate pool of money. Id. at 201:5-8, 202:1-3.

Furthermore, during his deposition, Mr. Prisco made clear to TD that Matrix was not a mere continuation of GI Apparel. Mr. Prisco testified as follows:

> To be clear, I never testified that any GI Apparel assets were transferred to Matrix. To the extent that I'm out there pursuing a similar business, the answer is yes. But all of the customers that I am pursuing are the same customers that anybody in the apparel business is going to pursue. There's nothing unique to those customers, they are just general apparel retailers.
>
> * * *
>
> I never utilized a customer list. The accounts that I go after are like Kohl's or Pamita, or a typical retailer that anybody would know. Nothing uniquely proprietary. I know you would like to assert that somehow Matrix benefitted from GI Apparel's account list but the answer is that Matrix is its own business, separately incorporated, pursuing customers that are, in my belief, the right

18

customers who go after for its product line. But I'm not using any of the assets [of] GI Apparel to do that.

Id. at 135: 9-18, 135:23-136:8.

In his current Certification, Mr. Prisco reiterates that Matrix did not purchase and does not use the trade name of GI Apparel, its inventory, its equipment, its contract rights, its causes of action or any other assets of GI Apparel. In fact, these assets were sold at the auction held by CIT to GI Apparel's competitors. See Prisco Cert. at ¶ 44. Under these circumstances, the Debtor would be hard pressed to argue that Matrix is the successor in interest of GI Apparel.

Even assuming that Matrix was a successor in interest of GI Apparel, the amount of back rent due from GI to the Debtor is nominal at best. As set forth in Mr. Prisco's Certification, GI Apparel's lease with the Debtor expired in December 2007 and the back rent due from GI Apparel is limited to one month's rent. Id. at ¶ 45.

Similarly, TD's claim that the Debtor is allowing Matrix to remain on the property rent free has been blown wholly out of proportion. Matrix initially occupied less than 1,000 square feet and currently occupies 2,000 square feet of the Property (or approximately 1.5% of the Property) to store samples and a small amount of inventory. Based on the market rental rate for the Property, this amounts to $1,000 a month. As set forth in Mr. Prisco's Certification, at most, Matrix is liable to the Debtor for $10,000. Id. at ¶ 38. In light of the fact that Mr. Prisco has not taken management fees from the Debtor, which would greatly exceed any unpaid rent by Matrix, and the fact that the Debtor can still pursue such claim until April 2012, the Debtor's decision not to prosecute a claim against Matrix does not constitute grounds for conversion.

Lastly, it must not be lost on this Court that TD's argument that the Debtor should be pursuing rents from Matrix is wholly at odds with the bank's claim that it is the true owner of the

rents. If the Assignment granted TD sole ownership rights in the rents, why should the Debtor be collecting same?

**3.      There is No Evidence of Self-Dealing by Mr. Prisco.**

There is no evidence of self-dealing by Mr. Prisco based on the Plan proposed by the Debtor. As set forth above, there is nothing inequitable about the Debtor cancelling all of its equity interest and the acquisition of the equity interest in the reorganized debtor by Mr. Prisco's wife for the sum of $6,000,000.

Furthermore, the mere fact that the Plan proposes a significant payment to CIT and that CIT has a claim against Mr. Prisco individually does not evidence self-dealing on his part. The Plan does not provide a release to Mr. Prisco for CIT's claim or any other claim.

**B.      The Debtor Has Not Engaged in the Unauthorized Use of Cash Collateral.**

Since the commencement of the Debtor's Chapter 11 bankruptcy case, all rents from the Debtor's principal tenant, The Beverage Works, Inc. have been paid directly to TD. Other post-Petition rents received from the Debtor's office tenants have been set aside in a separate bank account pending the Court's determination of the Adversary Proceeding between the Debtor and TD. TD is wholly aware of this.

The only monies utilized by the Debtor post-Petition are the revenues generated from its logistics business. The Debtor has consistently taken the position that such revenues do not fall within the Assignment as evidenced by the Adversary Complaint filed by the Debtor against TD seeking a declaratory ruling that the service/storage fees fall outside of the Assignment.

Prior to the Court adjudicating the issue of whether the service/storage fees fall within the Assignment, TD argues that the Debtor's use of the fees constitutes the unauthorized use of its cash collateral. This is outright absurd. It is telling that other than adding this red herring

argument to the Conversion Motion, TD has never filed an application, by way of Order to Show Cause, to stop the Debtor from utilizing the service/storage fees or even moved to dismiss the count relating to the service/storage fees in the Adversary Complaint.

Furthermore, Section 1112(b)(4)(D) of the Bankruptcy Code explicitly provides that a factor establishing "cause" for conversion is the "unauthorized use of cash collateral *substantially harmful to 1 or more creditors.*" 11 U.S.C. § 1112(b)(4)(D) (emphasis added). Here, TD was not harmed by the Debtor's expenditures as every penny of the service/storage fees has been applied to the expenses of the property, including taxes and insurance.

## C.    The Debtor is Not Grossly Mismanaged.

In a final weak attempt to establish cause for conversion, TD argues that Mr. Prisco is grossly mismanaging the Debtor's estate as tax returns have not been filed and the Debtor's records are purportedly in disarray.

As to the tax returns, the Debtor has yet to file tax returns for 2007, 2008 and 2009. The 2007 tax return is ready to be filed. As for the 2008 and 2009 tax returns, the Debtor's delay in filing them is largely due to TD's refusal to provide the Debtor with necessary information. In 2008 and 2009, TD paid certain expenses for the Debtor's property (ie. property taxes, electric, insurance and other expenses). The Debtor has requested TD's expense reports to complete its returns. TD has not cooperated in providing this information. To date, the Debtor has yet to receive this information and, thus, cannot complete its returns. See Prisco Cert. at ¶ 24.

While the Debtor acknowledges it has a responsibility to pay tax returns, the Debtor will have no income tax liability and the only liability owing to the taxing authorities will be a *de minimis* penalty. Id.

As for the Debtor's recordkeeping, this Court can certainly appreciate that the Debtor's business does not give rise to complex business records. The Debtor's monthly operating reports set forth all incoming revenues and expenses of the Debtor. Again, TD's selective quoting from Mr. Prisco's deposition testimony does not tell the whole story. Mr. Prisco testified that since he took over the recordkeeping responsibility of the Debtor in 2008, he is aware of all of the Debtor's records. Id. at 88:13-15. Although Mr. Prisco testified that the Debtor (which consists of Mr. Prisco and one other employee) does not have a formal documentation policy, the following testimony indicates that the Debtor is aware of its responsibility to maintain records:

Q.    Who is responsible for maintaining filing Prisco Property's records?

A.    I am.

Q.    Anyone else?

A.    No.

Q.    Is it your practice to destroy or throw out records?

A.    No.  I have kept everything I can.

Q.    So, to the best of your knowledge, any records that would have ever existed you have not purged?

A.    That is true.  I would never throw away documents, financial documents.

See Prisco Dep. as Exhibit A to Certification of John August, Docket No. 45 at 90:22-91:9.

**D.    Prior to the Petition Date, the Debtor Did Not Divert Rents.**

There has been no pre-Petition diversion of rents by the Debtor.  TD frivolously alleges that the Debtor diverted "rents" paid by Walmart to Matrix.  First and foremost, the Debtor maintains that Walmart is a storage client of the Debtor and, thus, the monies paid by Walmart to the Debtor are not subject to the Assignment.

Furthermore, the monies paid by Walmart did not benefit Matrix. In or around June of 2009, TD instructed the Debtor to open up an account at TD and manage the expenses of the Debtor. In November 2009, the account was frozen without notice. During this 5 month period, the Debtor collected approximately $240,000 and disbursed approximately $226,000, all of which is properly documented, relates to the Property and inured to the benefit of TD and passed through a bank account maintained by TD. See Prisco Cert. at ¶ 36.

In December 2009 or January 2010, there were heating system issues at the Property, which required immediate service to avoid pipe damage from freezing. Since the Debtor had no access to funds in the TD account, including the storage revenues that were not subject to the Assignment, Matrix paid the bills to East Coast Mechanical and Harry Merriman for these repairs. In addition, Matrix paid John Cottingham, a gentleman who performed administrative services to the Debtor. These expenditures aggregated $3,403, and were reimbursed to Matrix from storage revenues, which the Debtor believes are not subject to the Assignment. Id. at ¶ 37.

After TD froze the Debtor's bank account, based on the Debtor's belief that the storage fees, including Walmart payments, were not TD's property under the Assignment, the Debtor opened an account at another financial institution. These monies were used to (i) pay legal obligations of the Debtor; (ii) pay the broker commission attributed to Walmart; (iii) pay a part-time logistics employee; and (iv) the Matrix reimbursement referenced above. Id. at ¶ 38. Thus, there is no merit to TD Bank's claim that the monies paid by Walmart were diverted to Matrix.

## CONCLUSION

Based on the foregoing, the Debtor respectfully submits that the Conversion Motion should be denied and the Debtor should be afforded an opportunity to proceed with confirming the Plan.

NORRIS, McLAUGHLIN & MARCUS, PA
Attorneys for Debtor, Prisco Properties LLC

Date:  September 13, 2010          /s/ Morris S. Bauer